UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

DAVID H.[1],                           )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     CIVIL NO.  3:18cv983
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social

Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia,

"[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the

record including the evidence upon which the findings and decision complained of are based.

The court shall have the power to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to

any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act

through December 31, 2017.

2.     The claimant has not engaged in substantial gainful activity since February 1, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, obesity, chronic pain syndrome, COPD/restrictive lung disease, depressed bipolar II disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, alcohol use disorder, and cannabis use disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR404.1567 and 416.967(b) except that the claimant can occasionally climb ramps and stairs, he can never climb ladders, ropes, or scaffolds, he can frequently balance, stoop, kneel, crouch and crawl, he should avoid concentrated exposure to wetness and vibration, he should avoid concentrated exposure to fumes, odors, dusts, gases and other similar respiratory irritants, and he should avoid all exposure to hazards such as unprotected heights, wet, slippery or uneven surfaces, and unguarded moving machinery. In addition, he can make judgments on simple work related decisions, he can respond appropriately to usual work situations, he can respond appropriately to brief interactions with coworkers, supervisors and the general public, and he can deal with routine changes in a routine work setting.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on October 12, 1974 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills ( See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 16.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12 - 22 ).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on May 5, 2019. On June 21, 2019, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on July 3, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not

4

disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was born on October 12, 1974. (R. at 98) At the time of his filing date, he was 42 years old. *Id.* Plaintiff completed the 12th grade. *Id*. at 297. He worked in the past as a siding installer and heating and air conditioner installer. *Id*. at 21.

On May 23, 2016, Plaintiff visited his family practitioner Dr. Joel Valcarcel due to worsening depression and anxiety. (R. at 542) His depression and anxiety had worsened to the point it affected his ability to work as the symptoms caused his employer to fire him. *Id*. The struggle with keeping a job further worsened his depression and anxiety. *Id*. After examination, Dr. Valcarcel diagnosed Plaintiff with anxiety, depression, and left leg pain. *Id*. at 544. Dr. Valcarcel discontinued Plaintiff's Lexapro prescription and gave him samples of Fetzima. *Id.*

On June 6, 2016, Plaintiff presented himself to Dr. Valcarcel due to his depression and anxiety. (R. at 548) Since starting Fetzima, Plaintiff suffered severe headaches, to the point he needed to go to the emergency room. *Id*. He also reported this was his first mental breakdown as he got so angry he tore up his entire kitchen and threatened suicide if his wife left him. *Id*. After examination, Dr. Valcarcel diagnosed him with recurrent major depression resistant to treatment. *Id.* at 550. Due to the growing severity of his mental health disabilities, Dr. Valcarcel referred him to the Bowen Center for psychiatric care and counseling. *Id*. Dr. Valcarcel switched Plaintiff's Fetzima to Seroquel XR. *Id.* He discussed a safety plan with Plaintiff if he suffered a mental breakdown. *Id*. at 551.

On August 25, 2016, Plaintiff returned to Dr. Valcarcel due to his depression and anxiety. (R. at 554) Plaintiff could not tolerate Seroquel as it caused him excessive sleepiness. *Id*. He struggled to find a medication that would work for him; the medications Seroquel, Fetzima, Lexapro, and Cymbalta proved harmful and or ineffective. *Id*. Plaintiff's anxiety had worsened and he asked for a limited supply of Xanax. *Id*. Plaintiff had experienced suicidal thoughts recently. *Id*. After examination, Dr. Valcarcel continued past diagnoses. *Id*. at 556. Plaintiff felt hesitant to start any medication from Dr. Valcarcel as all previous medications proved harmful and/or ineffective. *Id*. at 557. He wanted to wait until he saw the psychiatrist. *Id*. Dr. Valcarcel recommended genetic testing to find the best medication regimen suited for Plaintiff. *Id.*

On November 11, 2016, Plaintiff presented to psychiatrist Dr. Jay Fawver due to "mood disturbances." (R. at 588) These mood disturbances and associated symptoms had occurred for "as long as [he could] remember." *Id*. Plaintiff struggled with controlling his symptoms because "everything' made Plaintiff nauseous, tired, and fatigued. *Id.* He muddled through the day with feelings of hopelessness and the inability to see the good in people. *Id*. Crying spells occurred. *Id*. Due to these depressive symptoms, Plaintiff sometimes flew into a rage, punching walls, kicking things, and slamming doors. *Id*. Anxiety, surrounding the thought of people talking about him, plagued his mind frequently. *Id*. at 589. When told what to do, his anxiety flared up. *Id.* at 588. Despite this, he struggled to remain attentive. *Id.* at 592. This, in turn, led to poor time management skills and difficulty remembering things such as appointments. *Id*. at 593. His symptoms revealed themselves physically as well in the form of tension headaches. *Id*. at 592. He attempted working at Blake Harris Construction, but due to his symptoms, he struggled with absenteeism. *Id.* at 596. After an in-depth evaluation of symptoms, Plaintiff's PHQ-9 and GAD-7

scores measured at a severe level. *Id*. at 588-597. Dr. Fawver diagnosed Plaintiff with moderate recurrent major depression, attention deficit hyperactivity, and social anxiety disorder. *Id*. at 599. He prescribed Mirtazapine, Bupropion, and Gabapentin. *Id*. Dr. Fawver stopped Plaintiff's Alprazolam. *Id*. He referred Plaintiff for genetic testing. *Id.*

On December 14, 2016, Plaintiff returned to Dr. Fawver due to his major depression. (R. at 602) Plaintiff couldn't tell if the medication worked or not because of the amount of turmoil in his life. *Id.* His PHQ-9 and GAD-7 scores improved somewhat from severe to moderately severe. *Id*. at 604. After examination, Dr. Fawver continued past diagnoses and increased Plaintiff's Bupropion and Gabapentin dosages. *Id.* at 607.

On February 2, 2017, Plaintiff reported to the Parkview Hospital due to falling from his roof. (R. at 408) Plaintiff had fell on his head and left shoulder; the worst of his symptoms comprised of a headache and left chest pain. *Id*. CT scans taken at Warsaw Hospital Emergency Room showed subarachnoid hemorrhage, moderate to large pneumothorax, hemorrhagic contusion, mild diffuse right-sided sulcal effacement, nondisplaced left twelfth rib fracture, as well as, pulmonary contusion and hemorrhage. *Id*. at 408, 411-412. Plaintiff was discharged on February 7, 2017 with prescriptions for Robaxin, Oxycontin, Percocet, Miralax, and Pericolace. *Id*. at 406

On February 17, 2017, Plaintiff presented himself to nurse practitioner Jeanette Cochran, NP, due to major depression and social anxiety. (R. at 609) Plaintiff felt his anxiety had improved somewhat, but his depression remained problematic. *Id.* Emotional lability and irritability continued to be a struggle for Plaintiff. *Id.* He had suicidal ideation before the appointment. *Id.* Yet, some days he felt "on top of the world" and couldn't sleep for days. *Id*. His PHQ-9 and

GAD-7 remained at the high-end of a moderately severe ranking. *Id.* at 611. Upon examination, Ms. Cochran noted a cautious and slowed gait, pressured rate and rhythm speech, digress thought processes, and occasional memory disturbances. *Id.* at 618. Ms. Cochran diagnosed Plaintiff with bipolar, ADHD, generalized anxiety disorder, social anxiety disorder, and postconcussion syndrome. *Id.* at 619. She switched Plaintiff's Wellbutrin prescription for Lamotrigine and prescribed Lithium. *Id.* at 618-619.

On March 10, 2017, Plaintiff returned to nurse practitioner Jeanette Cochran, NP, due to his bipolar disorder. (R. at 622) Plaintiff struggled with sleeping and complained of nightmares when he did fall asleep. *Id.* at 622-623. His thoughts raced and he wondered if Ms. Cochran still treated him for his ADHD. *Id.* at 623. The Lithium he had been prescribed only helped him momentarily before his symptoms returned. *Id.* His PHQ-9 and GAD-7 scores still marked as moderately severe to severe symptoms of depression and anxiety. *Id.* at 624. Upon examination, Ms. Cochran noted a sad affect and a pervasively pressured rate of speech. *Id.* at 632. Ms. Cochran continued past diagnoses and increased both Plaintiff's Lamotrigine and Lithium dosages. *Id.*

On March 10, 2017, Plaintiff presented himself to neurologist Dr. Jason Voorhies due to head injury he sustained when falling off a roof. (R. at 638) Plaintiff reported some concentration issues. *Id.* After examination, Dr. Voorhies advised Plaintiff he could drive again, but Plaintiff could still suffer from some postconcussive symptoms. *Id.* at 641.

On April 3, 2017, Plaintiff returned to nurse practitioner Jeanette Cochran, NP, due to his bipolar, anxiety, and ADHD. (R. at 730) Plaintiff reported to Ms. Cochran, "I haven't been doing very good." *Id.* He suffered depressive symptoms such as feelings of hopelessness, as well as

poor appetite and insomnia. *Id*. at 731. Suicidal ideation, nightmares, and crying spells plagued him. *Id.* His PHQ-9 and GAD-7 scores marked his depression and anxiety as severe. *Id*. at 733. After examination, Ms. Cochran continued past diagnoses. *Id*. at 737. Ms. Cochran added the medication Aripiprazole, held Lithium, and increased Plaintiff's Lamotrigine and Gabapentin dosages. *Id.*

On April 6, 2017, Plaintiff reported to The Bowen Center for a mental health assessment. (R. at 691) Plaintiff reported anhedonia, anxiety, concentration problems, fatigue, depression, hallucinations, restlessness, hypervigilance, impulsiveness, irritability, racing thoughts, sleep disturbances, and suicidal thinking. *Id*. Jobless, Plaintiff isolated himself in his house. *Id*. at 693. He admitted to aggressive or violent behavior, such as getting into fights. *Id*. at 691. His daughter feared his temper. *Id.* Plaintiff felt apprehensive about how drug usage would affect his disability claim. *Id.* However, he had been sober for several weeks. *Id.* Upon examination, the clinic noted Plaintiff appeared restless. *Id*. He had rapid speech, racing thoughts, and at times his thoughts were scattered. *Id*. Plaintiff showed his fingernails, which had been bitten down to the bone. *Id.* After his mental health assessment, the clinic referred Plaintiff for a psychiatric medication consultation and further rehabilitation services. *Id*. at 695.

On April 20, 2017, Plaintiff reported to nurse practitioner Jeanette Cochran, NP, due to his bipolar, anxiety, and ADHD. (R. at 740) Plaintiff stated, "I could be better. I've been super depressed. I think I'm doing worse this past week than I have in the prior...." *Id*. He suffered through frequent depressive symptoms such hopelessness, poor appetite, and insomnia. *Id*. Suicidal ideation plagued him more times than not. *Id*. at 741. Almost daily, he had trouble concentrating. *Id*. He got "so aggravated" at people he wished to harm them. *Id.* His sister

compared him to the Hulk, describing his periods of extreme anger and rages. *Id*. Plaintiff didn't want to be around people. *Id*. His PHQ-9 score still rated as severe, but his GAD-7 score rated as moderately severe. *Id*. at 743-744. After examination, Ms. Cochran continued past diagnoses. *Id.* at 747-748. Plaintiff and Ms. Cochran discussed transferring his psychiatric care to the Bowen Center. *Id.* at 748.

On April 27, 2017, Plaintiff reported to psychiatrist Dr. Shivam Dubey due to his anger. (R. at 946) Plaintiff suffered through low energy, low motivation, sad mood, anhedonia, irritability, anger, paranoia, focus problems, hyperactivity, and suicidal ideation. *Id*. He didn't like being around people. *Id*. Anxiety plagued him most days. *Id*. Plaintiff apprised Dr. Dubey he quit marijuana usage and had decreased his alcohol usage. *Id*. Upon examination, Dr. Dubey noted Plaintiff suffered a slow rate of speech, irritable mood, and restricted affect. *Id.* at 947. After examination, Dr. Dubey diagnosed Plaintiff with bipolar, anxiety, and ADHD. *Id*. at 948. Dr. Dubey increased Abilify and Mitazapine. *Id.* at 949. He advised Plaintiff to attend therapy to learn about better coping skills. *Id.*

On May 4, 2017, Plaintiff presented himself to Dr. Dubey due to depression, mood, and anxiety. (R. at 950) Plaintiff reported he suffered depression and high anxiety. *Id*. However, since last appointment the Remeron had improved his sleep, but too much to the point he slept in until early afternoon. *Id*. He suffered a irritable, sad, depressed, and anxious mood. *Id*. After examination, Dr. Dubey continued the same diagnoses and increased Plaintiff's Abilify and Remeron. *Id*

On June 9, 2017, Plaintiff reported to Dr. Valcarcel due to a seizure-like episode. (R. at 938) During this episode, Plaintiff became diaphoretic and felt like he could pass out. *Id*. He

could still hear but he was "out of it" and the next thing he knew he was in the bathroom. *Id*. According to his friend, Plaintiff had vomited and suffered urinary and fecal incontinence. *Id*. After examination, Dr. Valcarcel referred him to neurology for further evaluation. *Id*. at 941. Dr. Valcarcel advised Plaintiff not to drive, operate machinery, swim, or bathe in a tub until this evaluation by neurology. *Id*. Plaintiff declined treatment with Keppra. *Id*.

On June 29, 2017, Plaintiff presented himself to psychiatrist Dr. Kishore Sriram due to his bipolar and anxiety. (R. at 953) Plaintiff's mood varied rapidly, and his mind raced. *Id.* He had difficulties calming down when he became enraged. *Id*. After examination, Dr. Sriram diagnosed Plaintiff with depression, anxiety, and mood disorder. *Id*. Dr. Sriram added Tenex to Plaintiff's medication regimen. *Id.* at 955.

On August 3, 2017, Plaintiff presented himself to Dr. Sriram due to anxiety and racing thoughts. (R. at 994) At night, when he tried to sleep, he suffered racing thoughts and could not shut them down, disturbing his sleep patterns. *Id.* After examination, Dr. Sriram diagnosed Plaintiff with bipolar disorder, anxiety, and focusing problems. *Id.* Dr. Sriram switched Plaintiff's Vistaril for Buspar. *Id*. at 996. He increased Plaintiff's Tenex dosage. *Id.*

On September 28, 2017, Plaintiff presented himself to Dr. Sriram due to his depression, anxiety, and insomnia. (R. at 1265) Plaintiff felt his anxiety and depression had increased since his last visit; he felt the medications he took worsened his mental health. *Id.* The current dosage of Buspar helped him only momentarily. *Id.* The Remeron made him groggy, and he suffered sleep disturbances and poor appetite. *Id.* After examination, Dr Sriram continued past diagnoses. *Id*. at 1267. Dr. Sriram discontinued Plaintiff's Vistaril prescription, and then increased the dosages for his Buspar and Remeron prescriptions. *Id*.

On October 31, 2017, Plaintiff reported to Kosciusko Community Hospital Emergency Room due to an allergic reaction. (R. at 998) Upon examination, the hospital noted slight angioedema to Plaintiff's upper lip and raised uriticarial lesions on the skin. *Id*. at 1001. The lesions presented on his trunk and upper extremities and appeared pruritic. *Id*. The emergency room diagnosed Plaintiff with allergic urticaria and gastroesophageal reflux disease. *Id*. They treated him with Pepcid, Solu-Medrol, Benadryl, Maalox, and Lidocaine Viscous. *Id*. at 1002. Upon discharge, Plaintiff received prescriptions for Benadryl, Pepcid, and Zofran. *Id*. at 1003.

On November 2, 2017, Plaintiff returned to Parkview Hospital Emergency Room due to vomiting, fatigue, and hives. (R. at 1164) Associated symptoms included intermittent midsternal chest discomfort and shortness of breath. *Id*. Plaintiff could not take his medications due to the amount of vomiting he endured. *Id*. He revealed the hives had started the day before, but he cured it with Benadryl. *Id*. After examination, the hospital diagnosed him with gastroenteritis with some reflux. *Id*. at 1167. They treated him with fluids and antiemetics. *Id*.

On November 3, 2017, Plaintiff presented himself to Parkview Hospital Emergency Room due to hives, nausea, vomiting, fatigue, heartburn, and shortness of breath. (R. at 1168) Examination, diagnoses, and treatment were omitted from the record. *Id.*

On November 4, 2017, Plaintiff reported to Parkview Hospital Emergency Room due to hives. (R. at 1043) The hives occurred intermittently and seemed aggravated by stress and anxiety. *Id*. Plaintiff hypothesized the hives came from a medication allergy. *Id*. When he went to his psychiatrist appointment, the psychiatrist recommended that he go to the ER for further evaluation. *Id*. After evaluation, the hospital diagnosed him with gastroesophageal reflux disease and gastroenteritis. *Id*. at 1037. They admitted him to hospital and treated him with IV fluids,

antiemetics, Benadryl, and Solu-Medrol. *Id*. at 1038. He was advised to continue his Ativan treatment and followup with his family physician and psychiatrist. *Id*. at 1036. They released him on November 8, 2017 with prescriptions for Benadryl and a round of Prednisone. *Id*.

On November 9, 2017, Plaintiff returned to Dr. Sriram due to his anxiety. (R. at 1269) Plaintiff reported during his recent hospitalization the staff discontinued his Buspar medication, but his anxiety skyrocketed to the point he suffered anxiety attacks while hospitalized. *Id*. The hospital replaced the Buspar with Ativan. *Id*. Since starting Ativan, Plaintiff felt some improvement with his anxiety, but outside sources reported he still was anxious and irritable the majority of the time. *Id*. Upon examination, Dr. Sriram noted Plaintiff demonstrated a euthymic mood. *Id*. at 1270. After examination, Dr. Sriram continued past diagnoses. *Id*. Dr. Sriram started tapering down Plaintiff's Gabapentin dosage. *Id*. Finally, Dr. Sriram decreased Plaintiff's Ativan dosage. *Id*.

On December 7, 2017, Plaintiff returned to Dr. Sriram due to his depression and anxiety. (R. at 1272) Since his last visit, Plaintiff's depression and anxiety had worsened. *Id*. He limited any kind of substance usage such as marijuana and alcohol and had been completely sober for the past month. *Id*. Yet, outside sources stated he still cycled through his anxiety and depression daily. *Id*. Upon examination, Dr. Sriram noted Plaintiff presented an euthymic mood. *Id*. at 1273. After examination, Dr. Sriram continued past diagnoses. *Id.* Dr. Sriram changed Plaintiff's Ativan prescription to "as needed" and considered stopping it all together at the next visit. *Id*. at 1274. He prescribed Plaintiff Cymbalta and restarted Plaintiff's Vistaril. *Id.* However, for the Vistaril, Dr. Sriram instructed him to take it at bedtime for most beneficial effect. *Id.*

On December 13, 2017, Plaintiff reported to Dr. Valcarcel due to his recent emergency

room visit for vomiting and hives. (R at 1069) Plaintiff had multiple breakthrough gastroesophageal reflux symptoms. *Id*. After examination, Dr. Valcarcel continued past diagnoses and switched Plaintiff's Omeprazole for Lansoprazole due to insurance reasons. *Id*. at 1072

On February 8, 2018, Plaintiff presented himself to Dr. Sriram due to his bipolar disorder. (R. at 1278) Plaintiff reported feeling out of control. *Id*. His moods had been labile and he got frustrated easily. *Id*. At times, he thought of self-harm and hurting others. *Id.* Upon examination, Dr. Sriram noted Plaintiff had an euthymic mood. *Id.* at 1279. After examination, Dr. Sriram continued past diagnoses. *Id.* at 1280. Dr. Sriram increased Plaintiff's Abilify dosage. *Id*. He changed Plaintiff's Vistaril regimen to ten milligram twice a day and twenty milligram as needed for agitation. *Id*. Dr. Sriram also adjusted Plaintiff's Ativan regimen. *Id.* He would begin to taper Plaintiff off of Ativan. *Id*.

On February 8, 2019, Dr. Sriram filled out a residual function capacity form regarding Plaintiff's mental health. (R at 1305-1309) Plaintiff had been diagnosed with bipolar, ADHD, and generalized anxiety. *Id*. Associated clinical symptoms included mood lability, anger, anxiety, and self-harm thoughts. *Id*. Further symptoms included the following: anhedonia, impairment in impulse control, difficulty thinking and concentrating, psychomotor agitation or retardation, hyperactivity, and motor tension. *Id.* at 1306. His bipolar diagnosis had a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. *Id.* Due to his diagnoses, he would miss more than four days a month from any given job. *Id.* at 1309. Plaintiff had a limited but satisfactory ability to make simple work-related decisions. *Id.* at 1307. He was seriously limited, but not precluded in remembering work-like procedures, understanding and remembering very short simple instructions, carrying out very short and simple instructions,

sustaining an ordinary routine without special supervision, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions or request assistance, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, dealing with normal work stress, maintaining socially appropriate behavior, traveling in unfamiliar places, using public transportation, and being aware of normal hazards and take appropriate precautions. *Id*. at 1307-1308. However, he was unable to meet competitive standards with maintaining attention for two hour segments, maintaining regular attendance and punctual within customary, usually strict tolerances, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and respond appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, interacting appropriately with the general public, and dealing with stress of semiskilled and skilled work. *Id.* at 1307-1308. Attempts to control Plaintiff's symptoms comprised of medication management and individualized psychotherapy. *Id.* at 1305.

On February 9, 2018, Plaintiff returned to Dr. Sriram due to his anxiety. (R. at 1275) His anxiety had worsened since the last visit. *Id*. He struggled with irritability and agitation. *Id.* Mood swings occurred. *Id*. Plaintiff could feel fine and then go into a rage instantaneously. *Id*. Upon examination, Dr. Sriram noted Plaintiff had an euthymic mood. *Id.* at 1276. After examination, Dr. Sriram continued past diagnoses. *Id*. Dr. Sriram discussed a "safety plan" with Plaintiff and then increased Plaintiff's Cymbalta dosage and started him on Ativan. *Id.* at 1277.

On April 24, 2018, Plaintiff appeared for a hearing in Fort Wayne, Indiana before ALJ Stephanie Katich of the Fort Wayne, Indiana Office of Disability Adjudication and Review (ODAR). (R. at 219-223). After discussing an array of physical issues, Plaintiff explained how his mental health also encroached on his daily living. (R. at 43) Despite the ability to drive, Plaintiff needed to have his sister on trips due to his anxiety. *Id*. Plaintiff had trouble being around people. *Id.* Plaintiff stated, "I absolutely have tried to work most of my life off and on and I get angry and I can't handle authority. I feel like people are talking about me and I lose my control and my confidence and–and I start getting angry at people." *Id*. His behavior in the past included incidences of violence against other people. *Id*. at 44. At one of his first jobs, Plaintiff kicked a hose at his employer, abruptly ending his employment. *Id*. at 54. He had many incidences with his wife such as throwing a clock and, after recklessly driving, stopping somewhere and putting a shotgun in his mouth. *Id*. at 65-66. He feared in these rages that he would harm somebody. *Id.* at 66. Not only did the violent urges and anger affect him, but his racing thoughts and lack of focus also irritated people around him. *Id*. at 45. Even these symptoms interfered with his life, Plaintiff stated, "...I'll want to do something and then I'll get...have my mind to do something else, and then I'll have my mind to do something else, and then I end up just locking up and staying on the couch most of the time." *Id.* at 60. To cope with his symptoms, Plaintiff had sought medication treatment and psychotherapy at the Bowen Center, which he found to be of some benefit. *Id.* at 45. Plaintiff stated he played some guitar and wrote in attempts to soothe his symptoms. *Id.* at 59-60.

Not only did he turn to his sister for transportation, Plaintiff's sister helped in many other ways. (R. at 60-61) She helped him during his therapy sessions and she helped sign him up for

food stamps. *Id*. at 61. When he became suicidal or had thoughts of harming himself, Plaintiff's sister would talk him down from those thoughts. *Id*. Despite this, Plaintiff still experienced suicidal thoughts and self-harm thoughts. *Id*. The most recent occurrence of these thoughts happened the day before the hearing. *Id.* The symptoms broke through even through medication management. *Id*. at 63. His psychiatrist struggled to find the right dosages and medications to control Plaintiff's anxiety and ADHD. *Id*. Plaintiff had crying spells two to three times a week. *Id*. at 67. He needed his Mirtazapine prescription as he could not sleep without it. *Id.* at 65. With some psychiatric medications, Plaintiff had adverse reactions such as chest tightness and hives. *Id*. at 68. He used to smoke marijuana and drink alcohol as a way to self-medicate, but he had been sober for time. *Id*. at 68-69. Plaintiff cited the reason he needed disability was because he was "dangerous to other people". *Id*. at 69.

The hearing concluded with the questioning of the vocational expert James Breen. (R. at 73) Mr. Breen classified Plaintiff's past work as siding installer, as well as heating and air conditioning installer. *Id.* at 74-75. The ALJ next posed hypothetical situations regarding a person with the same education and past work as Plaintiff. *Id*. at 75. The first hypothetical stated the following:

> [C]ould perform the full range of light exertional work activity except...can occasionally climb ramps and stairs...never climb ladders, ropes or scaffolds...can frequently balance, stoop, kneel, crouch and crawl...avoid concentrated exposure to wetness and vibration...avoid concentrated exposure to fumes, odors, dusts, gases, and other similar respiratory irritants...avoid all exposure to hazards such as unprotected heights, wet, slipper or uneven surfaces, unguarded moving machinery...can understand, remember, and [carry out] simple instructions and tasks...can make [judgements] on simple work-related decisions...can respond appropriately to usual work situations...can respond appropriately to brief interactions with coworkers, supervisors and the general public...can deal with routine changes in a routine work setting.

*Id*. at 75-76.

The ALJ clarified that "brief" meant less than occasional but more than none. *Id*. at 76.

The vocational expert and the ALJ agreed that "brief" meant one percent to thirty-three percent of

the time. *Id*. at 77. Therefore, with this hypothetical, Plaintiff's past work would be eliminated.

*Id*. at 78. However, positions as a hand packager, electrical accessories assembler, and mail sorter

would all be viable jobs. *Id*. at 79. Employers would only tolerate an off task percentage of fifteen

percent of the workday. *Id*. at 81. This equated to nine minutes here and there during a hour. *Id*. at

82. Fifteen percent slower than the average worker would not be tolerated. *Id.* at 83. Any more

than one to two absences a month would be unacceptable in the work place. *Id.*

Plaintiff's attorney questioned if there were jobs in the economy that would allow for no

contact with coworkers or the public and limited contact with supervisors. (R. at 84-85). The VE

responded that such restrictions would eliminate competitive employment and would classify as

accommodations in the workplace. *Id*. at 85.

In support of remand, Plaintiff first argues that the ALJ's evaluation of the opinion

evidence in assessing the RFC lacked substantial evidence.   Specifically, Plaintiff claims that the

ALJ committed reversible error in rejecting the disabling assessment of mental limitations

provided by Plaintiff's treating psychiatrist, and wholly adopting the mental residual functional

capacity assessed by state agency psychologists whom did not have the benefit of reviewing

evidence that was available at the hearing level. (R. at 20). Plaintiff contends that the ALJ's

failure to provide a logical and accurate reason for dismissing the opinion of Plaintiff's treating

psychiatrist, Dr. Sriram, is reversible error.  Plaintiff points out that the ALJ admitted the

evidence suggested more restrictive mental limitations than the state agency psychologists

assessed, yet adopted the exact mental residual functional capacity they opined as her own. (R.at 20, 146). The ALJ then proceeded to reject the only other psychological expert opinion in the file, that of Dr. Sriram. Plaintiff argues that assessing the residual functional capacity with the guidance of only an admittedly uninformed medical opinion while rejecting the disabling opinion of the treating psychiatrist amounts to the sort of unilateral and unsupported medical judgment the Seventh Circuit has continually characterized as a "clear no-no" and "playing doctor." *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014), citing *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir.2003); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996).

Clearly, the ALJ failed to provide a logical and accurate explanation for dismissing the opinion of Plaintiff's treating psychiatrist, Dr. Kishore Sriram. The Social Security Administration gives substantial deference to the opinions of treating physicians. Indeed, a treating doctor's opinion must be given controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir.2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir.2010). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Scott*, 647 F.3d at 739; *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306. Even if an ALJ does not give a treating physician's opinion controlling weight, the regulations still require him to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir, 2006); *Scott*, 647 F.3d at 740; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir.2009) (citing 20 C.F.R. § 404.1527(d)(2)). No

such consideration took place in this case.

The ALJ rejected Dr. Sriram's opinion of Plaintiff's inability to "meet competitive standards with regards to maintaining attention, being punctual, working in coordination with others, accepting instructions and criticism, and responding to changes in a routine work setting" on the basis "these extreme limitations are nor supported by the record, and Dr. Sriram failed to provide either persuasive analysis or accompanying explanation with the opinion." (R. at 20). However, Dr. Sriram did provide a basis for his opinions. He explained "mood lability," "anger," "anxiety," and "self-harm thoughts" provided the basis for his opinion. (R. at 1305) The ALJ points to no regulation which requires Dr. Sriram put forth such an explanation in a narrative form. Nor does the ALJ's decision provide any mention of the basis of her opinion and fails to explain why such bases as "anger" and "mood lability" do not substantiate severe limitations to the ability to "work in coordination with others" or appropriately "accept instructions and criticism."

As noted, the ALJ must grant "controlling weight" to any treating source opinion which is "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Here, the ALJ purported to make such a finding, but did not refer to a single item of evidence which was inconsistent with Dr. Sriram's assessment of limitations. (R. at 20). The record clearly demonstrates Plaintiff's severe social and concentration-related limitations: Plaintiff was fired due psychological symptoms (R. at 542); irritability, self-destructive behavior and outbursts (R. at 548, 589, 741, 947, 953); crying spells (R. at 588, 731); severe PHQ-9 and GAD-7 scores (R. at 588-597); pressured rate and rhythm of speech (R. at 618, 632, 691); slow speech (R. at 947) digressive thought process (R. at 618, 691); memory disturbance (R. at 618); excessive fingernail

biting (R. at 691); and hospitalizations for shortness of breath, hives, and vomiting which were hypothesized to be stress/anxiety induced (R. at 1164, 1168, 1043, 1269). The ALJ's labeling Dr. Sriram's opinion as "inconsistent" with the record sheds no light on why she concluded such a multitude of supportive clinical findings were not indicative of Plaintiff's true residual functional capacity. Such a failure deprives this Court of the requisite "logical and accurate" bridge from the evidence to the ALJ's conclusion that Dr. Sriram's opinion was "inconsistent" with the record.

Moreover, if an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In *Larson v. Astrue*, the Seventh Circuit reversed an ALJ decision because, while the ALJ expressly articulated a good reason for not giving a treating source opinion controlling weight, "the ALJ said nothing regarding [the] required checklist of factors." 615 F.3d 744, 650-651 (7th Cir. 2010).

In the present case, the ALJ granted the treating psychiatrist's opinion no weight. Yet the ALJ failed to mention a single one of the regulatory factors in relation to Dr. Sriram in deciding how much weight to assign the opinion. The ALJ never mentioned the fact Dr. Sriram was a specialist (psychiatrist) or that he treated Plaintiff for nearly a year Nor did she mention the frequency witch which Dr. Sriram examined Plaintiff (monthly). Because the ALJ "said nothing regarding [the] required checklist of factors" as it related to Dr. Sriram, remand is required. *Larson*, 615 F.3d at 650-651.

Additionally, the Seventh Circuit has continually held that it is reversible error for an ALJ

to wholly rely upon the opinions of state agency consultants who are unable to review substantial pieces of medical evidence in assessing a residual functional capacity. In February of 2018, the Seventh Circuit held, in a case which specifically dealt with psychological impairments, that "an ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 822 F.3d 722, 728 (7th Cir. 2018); citing *Stage v. Colvin*, 812 F. 3d 1121,1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment") In the present case, the ALJ admitted portions of the record which were unseen by the state agency psychologists.(R. at 20). Yet, the adopted, word-for-word, their narrative as her own mental RFC assessment.. (R. at 165)

In response, the Commissioner has not addressed the multitude of clinical observations in the record which demonstrate clear consistency with the limitations Dr. Sririam assessed. Rather, the Commissioner recites the ALJ's contention that because Plaintiff did not stop working until he suffered a traumatic injury, his mental limitations could not have been disabling. There are two problems with the ALJ's reliance on this notion. First, the ALJ makes an impermissible medical judgment that Plaintiff's psychological impairments could not have possibly worsened after falling from a roof and losing his job (R. at 408). And second, it ignores the fact that treatment notes indicate Plaintiff was previously fired due to his psychological impairments (R. at 542). The ALJ's failure to provide any logical and accurate bridge from the clinical evidence in the record to her conclusion that Dr. Sririam's disabling opinion was "extreme" deprives this Court of the ability to engage in meaningful review of that conclusion. Thus, remand is warranted on this issue.

Next, Plaintiff argues that the ALJ committed error in failing to account for moderate limitations to Plaintiffs ability to maintain concentration, persistence and pace. Because the Commissioner bears the burden of proof at Step Five, an ALJ is required to orient the VE to the totality of a claimant's limitations. "[B]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). With regard to the ALJ's findings of moderate limitations of concentration, persistence, or pace, specifically, the Seventh Circuit has held that "among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Yurt*, 758 F.3d at 857; *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'"); *Varga v. Colvin*, 794 F.3d 809, 815-816 (7th Cir. 2015).

In *Varga v. Colvin*, the Seventh Circuit held that a hypothetical question limiting a person to simple, repetitive work with "few if any work place changes and no more than occasional interaction with coworkers or supervisors" did not even address moderate limitations in concentration, persistence, or pace, let alone adequately account for them. 794 F.3d 809, 814-815 (7th Cir. 2015). Further, the Court held that an ALJ's limiting claimant to work "free of fast-paced production requirements" did not adequately address Plaintiff's limitations to the pace of his performance because the ALJ failed to adequately define "fast-paced production" in a way that would bear any vocational significance to the testifying vocational expert. *Id*. at 815.

In the present case, the ALJ did not actually provide for any limitations to Plaintiff's ability to sustain concentration throughout the work day in assessing the residual functional

capacity and presenting hypothetical questions to the vocational expert. (R. at 17, 74-80). The ALJ's limiting Plaintiff to the ability to "understand, remember and carry out simple instructions and tasks. . . . make judgments on simple work related decisions. . . .respond appropriately to usual work situations. . . .respond appropriately to brief interactions with co-workers, supervisors and the general public. . . .and deal with routine changes in a routine work setting" is similarly deficient to the limitations assessed by the adjudicator in *Varga*. Here, the ALJ did not even account for any limitation to Plaintiff's work pace as part of the residual functional capacity or hypothetical questions to the vocational expert, despite finding a moderate limitation in the body of her decision. Moreover, the Seventh Circuit has long held that a limitation to the completion of "simple, routine tasks" refers to unskilled work which indicates the amount of time required to learn how to perform a particular job, not how long a claimant can sustain concentration without requiring a break or wandering off task, "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments — e.g., with difficulties maintaining concentration, persistence, or pace — can perform such work. For this reason, we have repeatedly rejected the notion that a hypothetical like the one here 'confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.'" *Varga,* 794 F.3d 814-815; citing *Yur*t, 758 F.3d at 858-59 (citing *Stewart v. Astrue*, 561 F.3d 679, 685 (7th 815*815 Cir.2009) (collecting cases)); *see also Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (restricting claimant to unskilled, simple work does not account for his difficulty with memory, concentration, and mood swings); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir.2004).

Moreover, the ALJ's residual functional capacity is further undermined by the fact she

wholly adopted the mental residual functional capacity assessed by the state agency consultants despite her own admission it did not reflect all Plaintiff's mental limitations . (R. at 20). The ALJ failed to even mention the "worksheet" limitations assessed by the state agency which seemingly supported the more severe limitations assessed by Plaintiff's treating psychiatrist: moderate limitation in the abilities to maintain attention and concentration for extended periods of time, accept instructions and respond appropriately to criticism from supervisors, and get along with coworker or peers without distracting them or exhibiting behavioral extremes. (R. at 163-164). The Court in *Varga* made clear that it is reversible error for an ALJ not to address the aforementioned "worksheet limitations." 794 F.3d 809, 814-816 (7th Cir. 2015).

In response, the Commissioner concedes the ALJ did not consider the state agency psychologists' more restrictive "worksheet limitations" and puts forward no case law to distinguish the *Varga* Court's opinion that such an omission is error. *Varga v. Colvin*, 794 F.3d 809, 814-816 (7th Cir. 2015) Likewise, the Commissioner puts forward no case law or argument to distinguish from the Seventh Circuit precedent which finds that limiting a claimant to "simple, routine, tasks" does not account for or communicate moderate limitations in concentration, persistence or pace. Accordingly, this Court will remand on this issue also.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Order.

Entered: August 5, 2019.

s/ William C.  Lee
William C. Lee, Judge
United States District Court